**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FKFJ, INC., INTERNATIONAL REALTY INVESTMENTS LLC, ISAM SAMARA, and MUWAFAK S. RIZEK,** | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 18 C 2828** |
| **v.** | ) | |
| | ) | **Judge Jorge Alonso** |
| **VILLAGE OF WORTH, MARY WERNER, MARK MICETICH, VILLAGE OF WORTH POLICE OFFICER #207, #208, #210, #213, #223, #224, #227, #234, and UNKNOWN VILLAGE OF WORTH POLICE OFFICERS,** | ) ) ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiffs, Isam Samara, Muwafak Risek, and their business entity, FKFJ, Inc. ("FKFJ"),[1]

bring this suit against the Village of Worth, its president Mary Werner, and its chief of police Mark

Micetich,[2] asserting various claims pursuant to 42 U.S.C. § 1983 and state law, all stemming from

certain acts of alleged harassment in retaliation for Samara and Rizek's support for Werner's

political opponent. Defendants have moved for summary judgment. For the following reasons, the

Court grants the motion for summary judgment as to plaintiffs' federal § 1983 claims and declines

to exercise supplemental jurisdiction over the remaining state-law claims.

---

[1] Initially, International Realty Investments LLC ("International Realty") was also among the plaintiffs, but it settled with defendants and stipulated to dismiss its claims. (*See* Stipulation of Dismissal, ECF No. 114.)

[2] In addition to these named defendants, plaintiffs initially asserted their claims against certain Village of Worth police officers, some unknown and others identified only by their badge numbers. But plaintiffs never identified these officers by name in an amended complaint, much less served them with process, so any claims against them are dismissed. *See Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007).

## BACKGROUND

Plaintiff Isam Samara leased property at 7011 West 111th Street in Worth, Illinois, from a business entity controlled by his brother, Husam.  Isam operated a restaurant on the premises, Saraya Café, beginning in 2012.  In 2016, Samara formed FKFJ with his son-in-law, Muwafak Rizek, for the purpose of remodeling the premises at 7011 West 111th and operating a new restaurant and banquet hall there, to be known as Saraya Restaurant & Banquet ("Saraya Restaurant").  Additionally, Isam had acquired a lease to a nearby building at 7013 West 111th Street, on which he intended for FKFJ to operate a hookah lounge known as Zaman Café.

Isam and Rizek remodeled the 7011 West 111th premises during the spring of 2016, and the new restaurant was open by July 2016.  A problem for the new restaurant was that parking was scarce in the area.  The Village had agreed to let FKFJ set up a valet stand at the 7011 property and park its customers' cars in a nearby Metra parking lot, but Isam identified another solution. He worked out an agreement with International Realty, the owner of the 7013 property, to allow customers to park behind a house at 7015 West 111th Street, which International Realty also owned.  Isam and International Realty also agreed to work together to demolish the 7015 building in October 2016 and put a parking lot on the property, which FKFJ would lease from International Realty.

In September of 2016, Randy Keller approached Isam and Rizek about supporting his campaign for president of the Village of Worth in the upcoming April 2017 election. Isam and Rizek agreed to support him and hosted campaign events for him at Saraya Restaurant.

2

In October 2016, FKFJ applied for a demolition permit. According to Isam, he had previously had a good relationship with the Village President, defendant Mary Werner,[3] but with respect to the demolition permit, it seemed to Isam that she "went out of her way to make it difficult." (Defs.' LR 56.1 Stmt. Ex. A, Isam Samara Dep. at 43:15-16, ECF No. 145-1.) She "approached Cook County about the water lines and something," which forced Isam to go "downtown" to "pay some kind of deposit or something." (*Id.* at 17-24.) Isam "always asked, why is not done? Why is it not approved?" and Werner blamed "waiting for Cook County" (*id.* at 45:9-12), which Isam found suspicious. "[F]rom [Isam's] perspective . . . she made it difficult," but Isam admitted that he did not recall the details exactly. (*Id.* at 44:1-13).

Werner seemed to recall the details with more clarity. At her deposition, she recounted that Rizek and Lori Zetterberg, an International Realty representative, first came to speak to her about getting a demolition permit in June 2016. Werner explained to them that, if they wanted to put a parking lot on the 7015 West 111th Street property, the first step was to acquire a demolition permit from Cook County (not the Village of Worth). Once they obtained that demolition permit, Werner explained, then they would need to apply for a special use permit before the Real Estate Development Board ("REDB") of the Village of Worth, because the property at 7015 West 111th Street was residentially zoned. The REDB would consider whether to recommend approval to the ultimate decisionmaker, the Village Board of Trustees.

Werner testified that, over the succeeding months, Rizek would frequently come back to the Worth Village Hall to inquire about the demolition permit, and Werner or village staff would have to reiterate that he needed to acquire a demolition permit before they could take steps toward

---

[3] The parties refer to Werner interchangeably as the Village president and "the mayor." *See* 65 ILCS 5/3.1-15-10 ("[T]he chief executive officer of a village shall be a village president, who may also be called a mayor.").

the special use permit. Additionally, the demolition would require water and sewer connections to be shut off—but the village's superintendent of public works and building commissioner determined that the relevant water and sewer lines run under 111th Street in space that is controlled by the Illinois Department of Transportation ("IDOT"), so FKFJ and International Realty would have to get a separate permit from IDOT. By August or September of 2016, they had still not obtained the necessary permits, but Rizek kept returning to village hall to ask for permission to begin the project anyway, and village staff kept reiterating that he needed to obtain the proper permits first.

Plaintiffs eventually obtained the proper demolition permits, and the house at 7015 West 111th Street was torn down in March 2017. Soon afterward, FKFJ filled the lot with gravel, which did not comply with Worth's ordinance on parking lot construction. Plaintiffs were warned by village staff that the gravel parking lot did not comply with the ordinance and patrons could not legally park there until the parking lot was properly paved. Additionally, plaintiffs had not yet secured the necessary special use permit. Plaintiffs initially put up caution tape or other obstacles to prevent anyone from parking in the lot during this time, but as time passed, visitors began to park in the lot anyway.

In April 2017, Werner won reelection as Worth Village President, defeating Randy Keller.

Plaintiffs submitted their special use permit application in April 2017, but the check for the fees bounced. Similarly, the check that Rizek wrote to Schroeder Materials for the gravel had bounced. When Rizek did not pay for the gravel even after being informed that the check had bounced, a representative of Schroeder Materials contacted the police. On May 17, 2017, a Worth police officer, Officer Ferchau, went to speak to the owner, Richard Schoeder, who informed him that Schroeder Materials had attempted to deposit Rizek's check twice, on March 31, 2017, and

April 3, 2017, but the check was returned for insufficient funds both times. Further, Rizek had ignored Schroeder Materials' initial attempts to contact him and had failed to show up for two appointments to make payment. Officer Ferchau then went to Saraya Restaurant to speak with Rizek. According to Officer Ferchau, Rizek stated that he knew that the account that the check was drawn on did not have sufficient funds,[4] he had heard from Schroeder Materials employees, and he would go to Schoeder Materials on May 22, 2017, to pay the outstanding balance. Officer Ferchau relayed that information to one of the Schroeder Materials employees he had spoken with and told her to notify the police if Rizek did not make payment on the 22nd. Rizek did not show up at Schroeder Materials on May 22, and Mr. Schroeder called the police again. He was told to come to the police station with the documentation supporting his complaint, and on May 23, 2017, Officer Luburich went to Saraya Restaurant to arrest Rizek for deceptive practices under 720 ILCS 5/17-1(B). Luburich placed Rizek in handcuffs, but he released him moments later because Rizek offered to make the outstanding payment to Schroeder Materials by phone on the spot.[5] Mr. Schroeder agreed to accept payment by phone and drop the matter from there.

In May 2017, plaintiffs submitted another check for the special use permit application fees, and this one cleared. Based on her knowledge of the process, Werner helped plaintiffs fill out parts of the application that they needed help with, but the application remained incomplete because the plaintiffs had not included a site plan. In June or July, plaintiffs submitted a site plan, and the matter came before the REDB. Initially, the REDB had several concerns, including the

---

[4] In its Local Rule 56.1 Response, plaintiffs purport to dispute that Rizek admitted this, but they do not properly cite to any contrary evidence. Rather, they cite to a portion of Rizek's deposition concerning another topic altogether that has nothing to do with the Schroeder Materials check. (*See* Pls.' LR 56.1 Resp. ¶ 18, ECF No. 150.)

[5] Plaintiffs purport to deny that Rizek offered to pay by phone, submitting instead that he was made to do so by force, but again they do not properly cite to any contrary evidence; the citation is to a portion of Rizek's 30(b)(6) deposition that does not concern this topic. (*See* Pls.' LR 56.1 Resp. ¶ 19.)

depth of the parking spaces, whether rainwater would run off across the sidewalk on 111th Street, and whether there was sufficient space for a motorist to make a three-point turn. The REDB voted to continue the meeting, but it recommended approval at the following meeting. The special use permit was ultimately approved by the Village Board in November 2017, although construction did not immediately begin.

Meanwhile, Worth police officers began to issue parking tickets for cars parked in the 7015 gravel lot. Mark Micetich, Worth's chief of police, learned during the May 2017 village board meeting that the new parking lot had not received the proper permits, and he issued a memorandum instructing police officers that "there is no parking" in that lot. (*See* Pls.' LR 56.1 Resp. Ex. M, May 30, 2017 Micetich Mem., ECF No. 151-13 at 1.) According to the memorandum, officers were to issue tickets using the information of the vehicles found in the lot, but in the name of "Saraya," and the tickets were to be "hand delivered to a manager at Saraya's." (*Id.*) According to Micetich, he instructed his officers to issue the tickets to Saraya Restaurant because he had learned that some officers had previously written tickets to the owners of vehicles parked in the lot at 7015 West 111th, but the owners had complained that they had not personally parked there; rather, Saraya Restaurant's valet attendants had parked their cars there. Over the following months, Worth officers wrote dozens of tickets to Saraya Restaurant for vehicles parked in the lot at 7015 West 111st Street. Isam and Rizek testified that they even saw officers writing tickets to cars parked elsewhere in the vicinity of the restaurant, not in the 7015 lot, and then later dropped those tickets off at Saraya Restaurant as well, although they did not have specific details about how many such tickets there were.

In October 2017, on the advice of the village's counsel, Chief Micetich issued a second memorandum directing officers to write six tickets for each car found parked in the 7015 lot, three

to Saraya and three to International Realty, for violations of specific sections of the village code pertaining to special uses and the operation of parking lots. Plaintiffs finally put a fence around the parking lot beginning in December 2017. At a subsequent administrative hearing, the Village dismissed the tickets against Saraya Restaurant because it was not the owner of the property at 7015 West 111th Street, although the tickets against International Realty remained.

At the end of December 2017, FKFJ's business licenses for Saraya Restaurant and Zaman Café were set to expire, so Isam and Rizek sought to renew them, but their applications for renewal were not accepted. Werner explained at her deposition that, in September 2017, Husam Samara, the owner of the Saraya Restaurant building at 7011 West 111th Street, came to Werner to complain that Isam and Rizek owed him some $250,000 in unpaid rent, such a large sum that he had been unable to pay the property taxes on the 7011 building. Distraught, Husam told Werner he was going to lose the building if he couldn't come up with the money, and he needed to find a new tenant. Werner had recently spoken with another man, Thaer Jbara, who had wanted to open a hookah lounge in Worth, but who had been unable to find suitable premises. When she next saw Jbara, Werner suggested that he contact Husam. Husam decided to lease the 7011 building to Jbara instead of Isam and Rizek. In October and November 2017, Husam and Jbara went through the process of applying for and obtaining a special use permit and license to operate a retail tobacco business at 7011 West 111th Street. When Isam and Rizek sought to renew the business license for Saraya Restaurant in December, Werner told them that the license could not be renewed because the village had already issued a retail tobacco license to someone else at that address.

Werner later determined that the Zaman Café license could not be renewed, either, because it had always been conditioned on access to valet parking at Saraya Café and, later, Saraya Restaurant. Once Saraya Restaurant stopped operating and a new tenant took over the premises at

7011 West 111th Street, Zaman Café did not have access to parking spaces in the numbers necessary to obtain a business license, at least until the parking lot at 7015 West 111th was completed. Zaman Café was forced to shut down for several months. Plaintiffs eventually completed the parking lot, and the Village of Worth renewed Zaman Café's business license.

In April 2018, plaintiffs filed this lawsuit. Defendants now move for summary judgment on all claims.

## DISCUSSION

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).

Plaintiffs assert six claims pursuant to § 1983, claiming violation of their (1) First Amendment rights, in retaliation for protected political activity; (2) Fourteenth Amendment equal protection rights; (3) Fourteenth Amendment procedural due process rights, (4) Fifth Amendment

right to just compensation for taking of private property; and (5) Fourth Amendment right to be free from unreasonable seizures, respecting Rizek's arrests; as well as (6) a conspiracy to violate these rights.  Additionally, plaintiffs assert numerous claims under state law, including (1) tortious interference with contract, for failing to timely issue the licenses and permits that plaintiffs needed to stay in business; (2) false imprisonment and abuse of process, for Rizek's arrests; (3) malicious prosecution, for the barrage of municipal citations plaintiffs received; and (4) conversion, for preventing plaintiffs from using their property to operate a business by issuing frivolous citations and failing to timely issue necessary permits and licenses.

Plaintiffs expressly assert all of these claims against the "Village of Worth" and "Mary Werner, individually and in her official capacity."  The Fourth Amendment claim, false imprisonment claim, and abuse of process claim are also asserted against other defendants, namely Mitch Micetich and certain unknown police officers, the latter of whom are dismissed from this case for failure to name or serve them, as stated above at note 2.  *See Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007).

## I.  LOST PROFIT DAMAGES

As an initial matter, defendants argue that the Court should grant their motion for summary judgment on all claims because plaintiffs have not produced sufficient evidence of lost profits damages.  Plaintiffs have submitted a "Sales Summary Report" which provides evidence of Saraya Restaurant's revenue in 2017, but Rizek provided only a rough and incomplete estimate of the restaurant's expenses at FKFJ's 30(b)(6) deposition.  He could not remember precisely how much Saraya Restaurant spent on certain categories of expenses such as food and marketing, and he could not estimate how much the restaurant spent on labor at all.  With such an imprecise accounting, defendants argue, plaintiffs cannot seek lost profits damages.  Further, according to defendants, the economic loss doctrine bars recovery of lost profit damages in a tort case.

"When seeking recovery of lost profits, the 'lost profits must be established with reasonable certainty and not be based upon speculation.'" *Kiswani v. Phoenix Sec. Agency, Inc.*, 247 F.R.D. 554, 558 (N.D. Ill. 2008) (quoting *Alover Distributors, Inc. v. Kroger Co.,* 513 F.2d 1137, 1140 (7th Cir. 1975)).  But reasonable certainty is not "mathematical certainty." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 634 (7th Cir. 2007) (citing *Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.,* 491 N.E.2d 912, 917 (Ill. App. Ct. 1986)).  "Lost profits, by their very nature, will always be uncertain to some extent and incapable of calculation with mathematical precision," and if courts required mathematical precision in every case, wrongdoers would be "immunize[d] . . . from the consequences of their wrongful conduct" merely because "the amount of damage they have caused is uncertain." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 199 (Ill. 2002).

Plaintiffs have set forth evidence of their revenue in the 2017 Sales Summary Report and evidence of their expenses at Rizek's 30(b)(6) deposition.  Defendants do not explain why a jury could not use this evidence to calculate reasonable lost profit damages, if the jurors were persuaded that Saraya Restaurant's revenue and expenses were likely to stay at least roughly the same in 2018 or beyond. Plaintiffs' evidence may lack "mathematical precision," but defendants have not explained why it is not the sort of "reasonable estimate of . . . damages" that is "adequate for cases in which a new business is snuffed out by a wrongdoer"; the estimate is at least "distinct from relying on a hope and a guess." *Parvati Corp. v. City of Oak Forest*, 709 F.3d 678, 685 (7th Cir. 2013).

Additionally, defendants have not accounted for other types of damages a jury might award; even nominal damages are available in a § 1983 case. *See Brandt v. Bd. of Educ. of City of Chicago*, 480 F.3d 460, 465 (7th Cir. 2007).  Thus, even if the Court agreed with defendants on

the issue of lost profits damages, it would not necessarily follow that defendants are therefore entitled to summary judgment on all claims.

As for the economic loss doctrine, the doctrine is not as broad as defendants claim, and defendants have not demonstrated that it applies here. According to defendants, "[t]he economic loss doctrine states that lost profits, without any claim of personal injury or damage to other property, are not recoverable in tort." *Kiswani*, 247 F.R.D. at 559. But the doctrine arose in the context of "defeated expectations of a commercial bargain," *In re Chi. Flood Litig.*, 680 N.E.2d 265, 275 (Ill. 1997) (internal quotation marks omitted); *see Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 567 (7th Cir. 2012) ("The economic loss doctrine . . . bars recovery in tort for purely economic losses arising out of *a failure to perform contractual obligations.*") (emphasis added); and defendants have not demonstrated why the doctrine should apply here, where there is no "commercial bargain" between the parties. Even in the case defendants principally rely upon, the court stated that it was unaware of any case applying the economic loss doctrine to a § 1983 claim and it "[did] not find it necessary to do so" itself, instead predicating its ruling on other grounds. *Kiswani*, 247 F.R.D. at 559. Further, "under Illinois law certain intentional torts such as intentional interference with economic advantage claims are not limited by the economic loss doctrine," *Preferred Landscape & Lighting, LLC v. Alban*, 162 F. Supp. 3d 746, 753 (N.D. Ill. 2016), and given that plaintiffs must prove that defendants acted "'knowingly or with deliberate, reckless indifference,'" *Backes v. Vill. of Peoria Heights, Ill.*, 662 F.3d 866, 870 (7th Cir. 2011) (quoting *Jones v. City of Chicago,* 856 F.2d 985, 992-93 (7th Cir. 1988)), those intentional torts might be a more apt comparison to plaintiffs' claims than those to which the economic loss doctrine has been held to apply.

The Court is not persuaded by defendants' argument on this issue, but it need not rule definitively on it. As the following discussion will reveal, plaintiffs do not show a genuine dispute of material fact on any of their § 1983 claims, so the Court need not reach the question of damages.

## II.  SECTION 1983 INDIVIDUAL CAPACITY CLAIMS AGAINST WERNER AND MICETICH

Plaintiffs assert claims against two individual defendants, Werner and Micetich, in their individual capacities. Under § 1983, liability can only be imposed on a person who "*subjects, or causes to be subjected*, any citizen . . . or other person . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (emphasis added). Thus, § 1983 establishes "a cause of action based upon personal liability and predicated upon fault." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). "An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012) (internal quotation marks omitted).

A person has sufficient personal responsibility for another state actor's constitutional deprivation to "cause" it without participating in it if he "approves of the conduct and the basis for it." *Backes*, 662 F.3d at 869-70 (internal quotation marks omitted). Supervisors, for example, "may still be personally liable for the acts of [their] subordinates," *id.*, if they "know about the [subordinates'] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. [The supervisors] must in other words act either knowingly or with deliberate, reckless indifference." *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (quoting *Jones*, 856 F.2d at 992-93).

### A.  *First Amendment Retaliation*

Determining the merits of a § 1983 claim of retaliation for the exercise of First Amendment rights requires a three-step process: (1) the plaintiff must demonstrate that he engaged in

constitutionally protected speech or expressive activity; (2) the plaintiff must establish that the speech was a substantial or motivating factor in an adverse action taken against him; and (3) if the plaintiff carries his burden on the first two steps, the burden shifts to the defendant to establish that it would have taken the same action even in the absence of the plaintiff's protected activity. *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004), *disapproved on other grounds in later appeal*, 481 F.3d 961 (7th Cir. 2007); *see Farrar v. Grochowiak*, No. 03 C 6193, 2005 WL 1126540, at *6 (N.D. Ill. May 4, 2005), *aff'd sub nom. Farrar v. Grocowiak*, 157 F. App'x 928 (7th Cir. 2005). Defendants do not dispute that showing support for a political candidate, including by hosting campaign events for him, is activity that is protected by the First Amendment. However, according to defendants, plaintiffs have not demonstrated any motivating or causal connection between the mayoral campaign and plaintiffs' disputes with Werner and the Village, and "the mere fact that one event preceded another does nothing to prove that the first event caused the second." *Farrar*, 2005 WL 1126540, at *7 (internal quotation and alteration marks omitted) (citing *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000)). The Court agrees with defendants.

First, plaintiffs do not adduce any direct evidence of retaliation; that is, they have adduced no evidence of any statements Werner made in which she admitted harboring any grudge against plaintiffs stemming from their support of her mayoral opponent. The closest they come is to point to Isam's testimony that Werner told him that Worth police officers went to Saraya Restaurant "to make [Rizek] pay," but in context, this obviously referred to the officers' investigation of the Schroeder Materials' deceptive practices complaint and paying the debt Rizek owed to Schroeder Materials, not making him pay for supporting her opponent.

Plaintiffs are no more successful with the circumstantial evidence they cite. They argue that Werner was hostile to them, but mere hostility is not enough. "Only retaliatory conduct that

would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Williams v. Watson*, No. 3:17-CV-177, 2019 WL 176826, at *3 (N.D. Ind. Jan. 11, 2019) (internal quotation marks omitted); *see also Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989) (Posner, J.) ("Harassment of a public employee for his political beliefs violates the First Amendment unless the harassment is so trivial that a person of ordinary firmness would not be deterred from holding or expressing those beliefs."). The fact that Werner seemed to lose patience with plaintiffs as time wore on is "trivial" and of little significance by itself; at most, it may be of some evidentiary significance to the extent it suggests a motive for concrete adverse actions.

Plaintiffs' response brief describes only a couple of concrete actions that, they argue, amount to retaliation: (1) Werner's requests for permit fees that plaintiffs did not know they owed and (2) the barrage of parking tickets issued to Saraya Restaurant in the summer and fall of 2017. (*See* Pls.' Resp. Br. at 11, ECF No. 152.) But plaintiffs have not pointed to any evidence that Werner was the one behind these fees or citations, and, to the contrary, defendants have amply demonstrated that these actions were a part of regular village governance in which Werner brought no particular discretion to bear and exercised no particular influence.

Regarding the fees, Werner explained that during her presidency, which began in April 2013, she had instituted a new policy of asking special-use-permit applicants to pay a deposit of $2,500 up front. According to Werner, under the old policy, disappointed applicants would sometimes refuse to pay the fees after an unsuccessful application process, which required the village to absorb the costs of any hearings and attorneys' fees it incurred. (*See* Defs.' LR 56.1 Stmt. Ex. G, Werner Dep. at 75-76, ECF No. 145-7.) Isam was apparently unaware of this policy change (*see id.*, Ex. A, Samara Dep. at 50-51), but plaintiffs adduce no evidence suggesting that it

14

was fabricated or that it was enforced selectively. They do not describe any similar special-use applicants who were treated differently with respect to the up-front fee deposit during the same time frame, nor is there any other evidence that this policy was a pretext for retaliation. There is only Werner's unrebutted testimony, which reveals nothing that she did to improperly slow the process down or increase its costs to plaintiffs.

As for the parking tickets, there is no evidence that Werner was personally behind their issuance, particularly to whatever extent, if at all, they were anything but a lawful exercise of authority to enforce the village's zoning regulations. The evidence shows that by the spring of 2017, when plaintiffs demolished the building at 7015 West 111th Street and filled the lot with gravel, plaintiffs had not yet received a special use permit to operate any parking lot on that site, much less a gravel one that did not conform to the applicable municipal regulations. Nevertheless, cars were being parked there, and indeed Chief Micetich had been told that Saraya Restaurant's valet attendants were the ones parking the cars there. Therefore, Saraya Restaurant received tickets for cars parked on that lot until they enclosed the illegal parking lot with a fence. Isam and Rizek testified that plaintiffs received other tickets for cars parked elsewhere in the vicinity, not just in the 7015 parking lot, but no such tickets appear in the record, nor did Isam and Rizek's testimony on the subject contain any details about their numerosity, nor did plaintiffs or their counsel discuss any such tickets at the February 2018 administrative hearing, when all the tickets against Saraya Restaurant were dismissed.

There is no evidence tying Werner, the only individual defendant named in the First Amendment retaliation claim, to the issuance of any tickets at all, whether for parking in the 7015 lot or not. Micetich stated at his deposition that he issued the May 2017 memo to his officers based on discussion of the parking lot at certain Village Board meetings around that time, and he

modified the memo in October 2017 based on advice of counsel. There is no evidence that Werner was involved in his decision to write either memo or the officers' decisions to write the tickets. Thus, there is no basis for holding Werner personally responsible for the tickets under § 1983. Even if there were, there is no genuine dispute that the tickets were issued because defendants violated the Village Code by allowing cars to park in the 7015 lot before it had been properly constructed and approved for that use; there is nothing so fishy about that as to suggest that it was a pretext for retaliation.

To survive summary judgment, plaintiffs are required to go beyond the pleadings and point to evidence sufficient to support a verdict in their favor. *Modrowski*, 712 F.3d at 1168-69. They have not done so on their retaliation claim. There may have been tension between them and Werner, but any inference that this tension was due to retaliatory animus rests on little more than speculation. Plaintiffs have not demonstrated by way of evidence or authority that Werner took any concrete adverse actions that were anything other than a good-faith attempt to discharge the duties of her office. Even if she did take any improper actions toward plaintiffs, nothing connects Werner's actions to plaintiffs' support for her political opponent other than the fact that their conflict with her seemed to come on the heels of her mayoral campaign—but suspicious timing is generally not enough by itself to survive summary judgment, particularly where it does not come close on the heels of the protected expression. *See Kidwell v. Eisnhauer*, 679 F.3d 957, 966 (7th Cir. 2012). Further, defendants have adduced unrebutted evidence to suggest that plaintiffs' frustration with Werner stemmed from certain normal aspects of the zoning, permitting, and licensing processes, which Werner could not change and which would have been the same even in the absence of plaintiffs' protected activity. Plaintiffs have not raised a genuine dispute of material

16

fact as to their First Amendment retaliation claim, and defendants' motion for summary judgment is granted as to that claim.

### B. *Equal Protection*

The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1. To establish a denial of their equal protection rights, plaintiffs must prove either that they were (1) discriminated against because of their membership in a protected class, or (2) that they were intentionally discriminated against and there was no rational basis for that disparate treatment. *Ali v. Vill. of Tinley Park*, 79 F. Supp. 3d 772, 776-77 (N.D. Ill. 2015) (Shadur, J.). Although plaintiffs mention discrimination based on "race and religion" in their complaint, they have apparently abandoned[6] this theory at summary judgment; their response brief focuses on the second type of equal protection theory, the so-called "class-of-one" theory. In their response brief, plaintiffs argue that the issuance of parking tickets to Saraya Restaurant and the denial of plaintiffs' business licenses for Saraya Restaurant and Zaman Cafe at the end of 2017 violated plaintiffs' equal protection rights. (Pls.' Resp. Br. at 11-13.)

A class-of-one equal protection claim is "based on the principle that similarly situated people must be treated alike unless there is a rational basis for treating them differently." *Chicago Studio Rental, Inc. v. Ill. Dep't of Commerce*, 940 F.3d 971, 979 (7th Cir. 2019). To succeed on this claim, plaintiffs must prove that "(1) [they have] been 'intentionally treated differently from others similarly situated,' and (2) 'there is no rational basis for the difference in treatment.'" *Id.* at 979-80 (quoting *Paramount Media Grp., Inc. v. Vill. of Bellwood*, 929 F.3d 914, 920 (7th Cir.

---

[6] Even if they had not abandoned it, the record reveals no evidence to support any claim of discrimination motivated by race or religion.

2019)).[7] Similarly situated individuals "must be 'identical or directly comparable' 'in all material aspects.'" *Chicago Studio Rental*, 940 F.3d at 980 (quoting *Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015)). Thus, plaintiffs must "show that [they were] treated differently than another entity that is '*prima facie* identical in all relevant respects.'" *Chicago Studio Rental*, 940 F.3d at 980 (quoting *Paramount*, 929 F.3d at 920)).

Plaintiffs argue that other entities with unpaved gravel parking lots in Worth were treated differently, citing (1) an apartment building about a block away from the Saraya Restaurant site, owned by an International Realty representative, (2) Krapil's Restaurant, and (3) Schroeder Materials. According to plaintiffs, none of these entities received parking tickets in the manner that plaintiffs did, their gravel parking lots notwithstanding. But this hardly suffices to demonstrate that these other entities are identical or directly comparable with plaintiffs in all material aspects. The Seventh Circuit has explained that "similarly situated individuals must be very similar indeed":

> We have imposed on plaintiffs an equally high burden [as in the employment context] with regard to establishing someone who is similarly situated in the context of "class of one" equal protection claims. *See Bell* [*v. Duperrault*, 367 F.3d 703 708-09 (7th Cir. 2004)] (***individuals were not similarly situated in a "class of one" equal protection case where individuals submitted applications for pier extensions at different times, requested different extensions, or requested to replace existing structures rather than build new ones***); *Purze* [*v. Vill. of Winthrop Harbor*, 286 F.3d 452, 454-55 (7th Cir. 2002)] (***individuals were not similarly situated in a "class of one" equal protection case where the individuals submitted different variances than the plaintiff requested, submitted their plats during different time periods, or had requests granted by different and previous Boards***); *see also Manley v. Thomas*, 255 F.Supp.2d 263, 267-268 (S.D.N.Y. 2003) ("[T]he number and variety of factors bearing on the seriousness of the underlying offense and the likelihood that an offender will be a danger to the community make it impossible to conclude, on the bases of the sketchy data presented, that petitioner

---

[7] Still unsettled is the role that the defendant's motive for its disparate treatment plays in the analysis, but the Court need not reach that issue in this case because plaintiffs have not carried their burden on the other elements of the analysis. *See Chicago Studio Rental*, 940 F.3d at 980 (citing *Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887, 912–13 (7th Cir. 2012)); *Fares Pawn, LLC v. Ind. Dep't of Fin. Institutions*, 755 F.3d 839, 845 (7th Cir. 2014).

> has been singled out from among all homicide offenders for disparate treatment."); *Wantanabe Realty Corp. v. City of New York,* 2003 WL 21543841, at *14, 315 F. Supp. 2d 375, 395 (S.D.N.Y. 2003) ( "[Plaintiff] would have to show that other property owners whose structures for some reason were unwanted by high City officials were not also subjected to sham inspections and politically driven demolition processes.")

*McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002-03 (7th Cir. 2004) (emphasis added). Plaintiffs have made no attempt to demonstrate that these other entities similarly put up an unpaved gravel parking lot and began to use it in the middle of an arduous and public permitting process, despite warnings not to do so before they actually obtained the necessary special use permit. Nor have they shown that the same village officials were in office when those gravel parking lots were first established, or indeed that special use permits were even necessary on those sites.

With respect to Krapil's, which appears to be the closest comparison, Werner testified that she received complaints about that restaurant's unpaved gravel parking lot shortly after she took office in 2013, contacted the owner about the violation of village code, and in response, the owner paved the parking lot. There is no evidence that Krapil's was issued any citations in the interim, but neither is there any evidence of how the property was zoned or that the owner of Krapil's suffered from a "comparable set of failings" by failing to timely follow the proper process for obtaining a special use permit (if one was even necessary) before constructing the lot or by ignoring warnings, especially about allowing patrons to park in the unpaved portion[8] of the lot. *Burks v. Wis. Dep't of Transp.,* 464 F.3d 744, 751 (7th Cir. 2006) (internal quotation marks omitted); *see Fares Pawn*, 755 F.3d 839, 847 (7th Cir. 2014) (noting that "class-of-one claims must account for all of the plaintiff's conduct") (internal quotation and alteration marks omitted). There is even less evidence about the zoning, construction, and other details of the parking lots of the apartment

---

[8] Only a portion of the Krapil's parking lot was unpaved. (*See* Defs.' LR 56.1 Stmt. Ex. I, Bonnie Price Dep. at 96.)

building and Schroeder Materials. This showing is insufficient to demonstrate the "common features essential to a meaningful comparison." *Chavez*, 251 F.3d at 636 (internal quotation marks omitted). With regard to the renewal of business licenses, plaintiffs' showing is even more deficient; they do not cite any similarly situated comparators at all.

Even if plaintiffs *had* produced evidence of similarly situated entities treated differently, plaintiffs' claims would still fail because there are rational bases for the challenged conduct. *See Chicago Studio Rental*, 940 F.3d at 980 ("We just need to identify a conceivable rational basis for the different treatment; it does not need to be the actual basis for defendant's actions."); *Fares Pawn*, 755 F.3d at 845 & n. 2 ("If we can come up with a rational basis for the challenged action, that will be the end of the matter—animus or no."). As the Court has explained, Werner did not personally participate in the issuance of the parking tickets, nor was she personally responsible for it as necessary to be liable under § 1983. But even if she was personally responsible for the parking tickets, there was at least a rational basis for them, given that plaintiffs illegally allowed cars to park in the lot despite knowing that the lot was not up to code and plaintiffs lacked the proper permit. Further, it was at least rational for Werner to believe that it would be futile to permit plaintiffs to renew their business license at Saraya Restaurant for 2018, given that she knew that another business had obtained a license and permit to operate there with the landlord's approval. Similarly, it was rational for Werner to conclude that, without access to Saraya Restaurant's valet parking, there was insufficient parking to operate Zaman Café until the 7015 parking lot had been properly completed. Defendants present no argument or evidence to the contrary.

Plaintiffs argue alternatively that they need not provide evidence of similarly situated entities treated differently if a "totally illegitimate animus" is "readily obvious." *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (internal quotation marks omitted). First, this

approach is reserved for "unusual circumstances," and the Court sees "no basis to depart from the similarly-situated approach in this case, where the evidence of animus is slight at best and where alternative, legitimate explanations are not difficult to find." *Fares Pawn*, 755 F.3d at 845 n. 3. Further, even under this alternative approach, "if the government would have taken the action anyway, the animus will not condemn the action." *Nevel v. Vill. of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002). As the Court has explained in the preceding section, plaintiffs have not demonstrated that Werner had an obvious illegitimate animus against them, and even if she did, it appears that "the government would have taken the [same] action anyway," regardless of the animus. Again, there is no evidence that Werner participated in the issuance of the parking tickets in any way that might make her responsible for it under § 1983, and defendants do not dispute that they did not have the proper permit for their parking lot and it was not up to code, in any case. As for the business licenses, defendants do not genuinely dispute Werner's stated basis for refusing to accept their applications for renewal, namely, Husam's renting the 7011 building out from under them, nor do they explain how they intended to operate a restaurant without a building, so Werner's decision appears to have been inevitable.

Plaintiffs have not adduced evidence sufficient to create a genuine dispute of material fact on their equal protection claim against Werner. Defendants' motion for summary judgment is granted as to that claim.

### C. *Procedural Due Process and Takings Claims*

Plaintiffs claim that Werner's refusal to accept their application for renewal of their business licenses deprived them of a property interest without due process of law or just compensation. The Seventh Circuit has set forth the governing legal principles as follows:

> The Takings Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides: "[N]or shall private property be taken for

21

> public use, without just compensation." *Sorrentino v. Godinez*, 777 F.3d 410, 413
> (7th Cir. 2015) (quoting U.S. Const. amend. V). The Due Process Clause of the
> Fourteenth Amendment provides: "[N]or shall any State deprive any person of life,
> liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.
> "[I]n any due process case where the deprivation of property is alleged, the
> threshold question is whether a protected property interest actually exists." *Cole v.*
> *Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011).

*Bell v. City of Country Club Hills*, 841 F.3d 713, 717 (7th Cir. 2016). "Property interests are not created by the Constitution[; r]ather 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).

"[F]or an interest to be constitutionally protected [under the due process clause], the plaintiff must show she has 'a legitimate claim of entitlement to it' rather than 'a unilateral expectation to it.'" *Dyson v. City of Calumet City*, 306 F. Supp. 3d 1028, 1040 (N.D. Ill. 2018) (quoting *Bell*, 841 F.3d at 717). There is a protected property interest in an expected government benefit "only when the state's discretion is 'clearly limited such that the plaintiff cannot be denied the interest unless specific conditions are met.'" *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 900 (7th Cir. 2012) (quoting *Brown v. City of Michigan City, Ind.*, 462 F.3d 720, 729 (7th Cir. 2006)).

This case is not one in which the state's discretion is "clearly limited" such that plaintiffs had a "legitimate claim of entitlement" to renewal of their business licenses, rather than a merely "unilateral expectation of it.' The Worth Village Code's business regulations provide as follows with respect to approval of licenses and permits:

> If, after due consideration of the information contained within the application and
> related investigation and inspection reports, and after considering any other
> evidence presented, the Clerk shall determine that the application is satisfactory,
> the Clerk shall forward the application to the Village Board, who will review the

22

application, approve it, deny it, or request additional information from the applicant
or the Clerk. If the Village Board approves an application, the Building
Commissioner shall notify the applicant that the application has been approved,
pending completing and passing any incomplete inspections. The license or permit
shall be signed by the President, attested by the Clerk and then issued to the
licensee. If the Village Board denies an application, the Clerk shall notify the
applicant that the application has not been approved and that no license or permit
will be issued.

Village of Worth Code § 3-1-4.[9] The Code provides as follows, in pertinent part, with respect to

renewals of business licenses:

> Except as otherwise provided herein, each license may be renewed upon proper
> application and payment of the required fee, including payment of all outstanding
> fines, fees, judgments, costs and penalties owed by the licensee to the Village,
> County, State or Federal government. The Clerk is authorized to approve and
> execute license renewals upon determining that this chapter's standards and criteria
> have been met.

Village of Worth Code § 3-1-6(C). By providing that each license "*may* be renewed," "upon

determining that this chapter's standards and criteria are met," the Code leaves room for the

exercise of discretion in deciding whether to renew a license. An applicant is not necessarily

entitled to renewal merely upon submission of the application and payment of fees, if the

"standards and criteria" of the Code's business licensing chapter must also be met. *See Dyson*, 306

F. Supp. 3d at 1041 (finding that neither municipal "business license" nor "special use permit . . .

qualifies as property" for similar reasons).[10]

It is not clear precisely what the relevant "standards and criteria" are, but it *is* clear that

assessing whether the location is suitable for the business's purpose is a key element of the

approval process. *See id.* § 3-1-2 ("Each application shall . . . contain . . . the location or proposed

---

[9] https://codelibrary.amlegal.com/codes/worthil/latest/worth_il/0-0-0-1056.

[10] In *Dyson*, the court found that the plaintiff had a protected property interest, if not in the business license
or special use permit, at least in "the leasehold property itself." 306 F. Supp. 3d at 1042. But this case is
different; the Village declined to renew plaintiffs' business licenses precisely because plaintiffs had lost
their lease on the 7011 property, which was Husam's decision, not the Village's.

location of the place of business"); § 3-1-6(D) ("Licensees must inform the Clerk in writing of any proposed modifications to a business, including, without limitation, changes, alterations, additions or substitutions concerning or implicating the business's . . . location.") § 3-1-9 ("No license shall be issued for the conduct of any business, and no permit shall be issued for any purpose or activity if the premises and building to be used for the purpose do not fully comply with all applicable ordinances and regulations of the Municipality and the State of Illinois."); § 3-1-10 ("No license or permit for the operation of a business, establishment or activity in the Municipality shall be construed to permit its operation in more than one location in the Municipality; a separate license or permit shall be required for each location."); *see also* § 3-1-5 (requiring businesses to pay a larger licensing fee if "the size of the business premises exceeds one thousand five hundred (1,500) square feet"). Under the Code, the Village retains discretion to decline to renew a business license if the business no longer has suitable premises in which to operate, and plaintiffs do not dispute that their landlord had worked with a new tenant on licensing a new business at the 7011 property and planned to lease those premises to him instead. Given those undisputed facts, the Court agrees with defendants that plaintiffs had no legitimate claim of entitlement, as opposed to a unilateral expectation, of renewal of their business licenses, particularly given that their businesses no longer had access to their former facilities. Thus, there is no genuine factual dispute on plaintiffs' due process claim because plaintiffs have not demonstrated that they had a protected property interest in the renewal of their business licenses.

It follows that there is no genuine factual dispute on the takings claim. "'[P]roperty as used in [the Takings] clause is defined much more narrowly than in the due process clauses,'" so if plaintiffs have no protected property interest under the due process clause, then they have no protected property interest under the takings clause. *See Image Media Advert., Inc. v. City of Chi.*,

No. 17 C 4513, 2017 WL 6059921, at *4 (N.D. Ill. Dec. 7, 2017) (quoting *Pittman v. Chi. Bd. of Educ.*, 64 F.3d 1098, 1104 (7th Cir. 1995)); *see also Image Media*, 2017 WL 6059921, at *4 ("[P]ermits and licenses may be property under the Due Process Clause but not under the Takings Clause."). Defendants' motion for summary judgment is granted as to both the due process claims and takings claims against Werner.

### D. *Fourth Amendment Right to Be Free From Unreasonable Seizures*

To prevail on the claim that Rizek's Fourth Amendment rights were violated, plaintiffs "must show that there was no probable cause for his arrest." *Neita v. City of Chi.*, 830 F.3d 494, 497 (7th Cir. 2016). "An officer has probable cause to arrest if at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* (internal quotation marks omitted). Defendants argue that there was probable cause to believe that Rizek had committed the crime of deceptive practices, which is defined as follows:

A person commits a deceptive practice when:

(1) With intent to obtain control over property or to pay for property, labor or services of another, . . . ***he or she issues or delivers a check or other order upon a real or fictitious depository for the payment of money, knowing that it will not be paid by the depository.*** The trier of fact may infer that the defendant knows that the check or other order will not be paid by the depository and that the defendant has acted with intent to defraud when the defendant fails to have sufficient funds or credit with the depository when the check or other order is issued or delivered, or when such check or other order is presented for payment and dishonored on each of 2 occasions at least 7 days apart. . . .

(2) He or she issues or delivers a check or other order upon a real or fictitious depository in an amount exceeding $150 in payment of an amount owed on any credit transaction for property, labor or services, or in payment of the entire amount owed on any credit transaction for property, labor or services, knowing that it will not be paid by the depository, and thereafter fails to provide funds or credit with

25

the depository in the face amount of the check or order within 7 days of receiving actual notice from the depository or payee of the dishonor of the check or order.

720 ILCS 5/17-1(B).

Initially, it is unclear whether Werner or Micetich, the two named defendants for this claim, bear any personal responsibility for Rizek's arrest. Neither personally participated in it, and it is uncertain whether either knew the circumstances well enough to be fairly said to have approved or condoned it, particularly in Werner's case. But the Court need not delve more deeply into that issue because it agrees with defendants that there was probable cause to arrest Rizek on May 23, 2017, for deceptive practices.

By May 23, the information the investigating officers had was that Rizek had passed a bad check in March 2017 and attempted to dodge numerous subsequent attempts to collect the debt over the following two months, including by three times failing to show up to Schroeder Materials to tender payment when he had said he would do so. Even if the mere fact of writing a bad check may not suffice to provide probable cause to arrest for deceptive practices because it sheds little light on whether the suspect wrote the check with knowledge that it would bounce, the suspect's subsequent lies about making good on the debt may supply the necessary indicia of deceptive intent. *See Neumann v. Wright*, No. 93 C 2049, 1995 WL 616749, at *6 (N.D. Ill. Oct. 18, 1995) (Williams, J.) (officer had probable cause to arrest for deceptive practices when he knew that the § 1983 plaintiff had passed a bad check and subsequently made "representations to [the officer] that he intended to make good on the check but was waiting for a loan," but the plaintiff "never in fact made good on the check"); *Miller v. Washington*, No. 11 C 1520, 2013 WL 1340590, at *5 (N.D. Ill. Mar. 30, 2013) (mere fact that the § 1983 plaintiff "might have had a defense of lack of intent had he been charged with theft or deceptive practices" did not vitiate probable cause when officers were aware of circumstances suggesting otherwise); *see also Zic v. Italian Gov't Travel*

*Office*, 149 F. Supp. 2d 473, 477 (N.D. Ill. 2001) ("A fraudulent scheme may exist where a defendant [in a civil suit] repeatedly lies to the same plaintiff. Moreover, when a [fraud] defendant attempts to avoid obligations to a plaintiff and makes repeated unfulfilled promises, a scheme may exist.") (internal citations omitted). A reasonable officer could have reasoned that Rizek's subsequent lies showed his deceptive intent and concluded that Rizek had known from the beginning that his account lacked sufficient funds to cover the check he had written. *See Neumann*, 1994 WL 616749 at *6.

Even if the circumstances within the officers' knowledge were not sufficient to provide probable cause, "[q]ualified immunity is available if there is 'arguable probable cause' for the arrest," *Muhammad v. Pearson*, 900 F.3d 898, 908 (7th Cir. 2018), *i.e.*, if "a reasonable officer could have mistakenly believed that probable cause existed . . . in light of clearly-established law," *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998) (internal quotation marks omitted). There was at least arguable probable cause in this case because a reasonable officer could have believed it was fair to conclude that Rizek had likely known from the beginning that his account lacked sufficient funds to cover the check, given his subsequent lies about payment; plaintiffs have not "identified a single precedent—much less a controlling case or robust consensus of cases—finding a Fourth Amendment violation under similar circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590-91 (2018) (internal quotation marks omitted). Even if Werner or Micetich bear any personal responsibility for Rizek's arrest, and even if the Court agreed with plaintiffs that was no probable cause for the arrest (and it does not agree), defendants are protected by qualified immunity because the unlawfulness of their conduct was not "clearly established."[11] *See id.* at 589-90.

---

[11] Defendants only assert qualified immunity in reference to the Fourth Amendment claim; they do not raise a qualified immunity defense to any of plaintiffs' other § 1983 claims.

### E. *Conspiracy*

> To prevail on a conspiracy claim, "the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Put differently, [the plaintiff] must "show an underlying constitutional violation" and "demonstrate that the defendants agreed to inflict the constitutional harm." *Hurt v. Wise*, 880 F.3d 831, 842 (7th Cir. 2018). "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Beaman,* 776 F.3d at 511.

*Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018); *see Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979) *rev'd in part on other grounds,* 446 U.S. 754 (1980).

Plaintiffs appear to claim that Werner and Micetich conspired to violate plaintiffs' constitutional rights by directing Worth police officers to issue the parking tickets to Saraya Restaurant and arrest Rizek. This claim cannot survive defendants' motion for summary judgment for two reasons. First, as the Court has already explained above and will explain further below, plaintiffs have not shown that there is a genuine dispute of material fact as to whether they suffered any underlying constitutional violation, and there can be no actionable conspiracy to violate someone's constitutional rights if no constitutional violation occurs. Second, plaintiffs have not adduced sufficient evidence of any agreement between Werner and Micetich to create a genuine material factual dispute. There is evidence that Werner and Micetich were in contact about these matters (for example, Micetich called Werner to give her a "heads up" that police went to Saraya Restaurant to confront Rizek about the Schroeder Materials check (Defs.' LR 56.1 Stmt. Ex. G, Werner Dep. at 85-85)), but there is nothing to suggest that they reached an agreement to deprive plaintiffs of their constitutional rights pursuant to a "single plan." *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981); *see Williams v. Seniff*, 342 F.3d 774, 785-86 (7th Cir. 2003) (evidence of parallel action by various defendants who "expressed displeasure" with

plaintiff and that one of the defendants may have been "involved in the events surrounding [his] termination" was insufficient to permit a reasonable jury to infer a conspiracy to terminate him). Defendants are entitled to summary judgment on plaintiffs' conspiracy claim.

### III.    SECTION 1983 OFFICIAL CAPACITY CLAIMS AGAINST WERNER AND CLAIMS AGAINST VILLAGE OF WORTH

Plaintiffs also bring all of the above claims both against Werner "in her official capacity" and against the Village of Worth. Suing both Werner and Worth is redundant because suing a municipal official in her "official capacity" is "effectively the same as having brought suit against" the municipal entity she represents. *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1071 (7th Cir. 2012) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978)).

"A village or other municipality may be found liable under § 1983 [only] when it violates constitutional rights via an official policy or custom." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 694-95). "To establish an official policy or custom, a plaintiff must show that his constitutional injury was caused 'by (1) the enforcement of an express policy of the [village], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority.'" *Wragg*, 604 F.3d at 467 (quoting *Latuszkin v. City of Chi.,* 250 F.3d 502, 504 (7th Cir. 2001)) (emphasis added).

Plaintiffs take the third route, claiming that Worth violated their constitutional rights via an official policy because Werner is a person with final policymaking authority who caused deprivations of their constitutional rights. Defendants argue that Werner does not have final policymaking authority with respect to licensing, policing and ticketing. (*See* Defs.' Mem. at 7-8, ECF No. 144). The Court tends to agree with defendants that the Worth Village Code appears to put final policymaking authority in the relevant areas in the hands of the Village Board (which

29

must approve licensing decisions) or the chief of police, rather than the Village President. *See Wragg*, 604 F.3d at 468-69.

But regardless, the Court has explained above that plaintiffs have not shown a genuine issue of material fact as to whether Werner caused any deprivation of plaintiffs' constitutional rights, and just as this failure was fatal to their claims against her in her individual capacity, it is fatal to their claims against her in her official capacity, *i.e.*, against the Village of Worth. *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1062 (7th Cir. 2018) ("Because the [plaintiffs] cannot make out a constitutional violation in their claim against the individual officers, there can be no viable *Monell* claim based on the same allegations."); *see Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) ("The critical question under *Monell* . . . is whether a municipal . . . policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents."); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 306 (7th Cir. 2010) ("A governmental body's policies must be the moving force behind the constitutional violation before we can impose liability under *Monell*."). Defendants' motion for summary judgment is granted as to plaintiffs' *Monell* claims.

## IV.    STATE LAW CLAIMS

Plaintiff's remaining claims are state-law claims over which this Court lacks any independent jurisdictional basis. Having ruled on all the federal claims and per the general rule, the Court exercises its discretion to dismiss the state-law claims without prejudice. *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015) ("only in 'unusual cases' may a district court exercise its discretion to assert its supplemental jurisdiction" once federal claims have fallen out of the case before trial); *Wright v. Associated Ins. Companies, Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("[T]he

general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendant state-law claims rather than resolving them on the merits.").

## CONCLUSION

For the reasons set forth above, the Court grants in part defendants' motion for summary judgment [142].   The motion is granted with respect to plaintiffs' claims of deprivations of their constitutional rights under 42 U.S.C. § 1983.  The state-law claims and any claims against any unnamed individual officers are dismissed without prejudice.  Civil case terminated.


**SO ORDERED.**                                                   **ENTERED:   June 11, 2020**


_____

**HON. JORGE ALONSO**
**United States District Judge**